IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

OCT 22 2002

Michael N. Milby
Clerk of Court

| | |
|---|---|
| **JOSE IGNACIO MONTERRUBIO** | X |
| | X |
| V | X   CAUSE NO. **B-02-204** |
| | X |
| **GARY JOHNSON, Director** | X |
| Texas Department of Criminal Justice | |
| Institutional Division | |

### APPLICATION FOR WRIT OF HABEAS CORPUS

Comes now the Petitioner, Jose Ignacio Monterrubio to present the following Application for Writ of Habeas Corpus and to ask this Court for a new trial for the following reasons:

I.

Mr. Monterrubio is a death sentenced inmate. He was convicted in 1994 in Cameron County Texas after a trial that lasted only two weeks. He was then a 17 year old boy who had never been convicted of any other criminal offense and had never participated in any criminal activity. His trial lasted a total of two weeks, including jury selection. He was represented by a lawyer who had been his lawyer for only two months and was paid the sum of $5000.00 to represent him.[1] His lawyer secured the services of a private investigator but was allowed only $600.00 for his services, the maximum allowed by Cameron County. The jury was picked in five days and was selected, not from a special venire as required by Texas law, but from a jury pool which had already been the subject of criminal voir dire. Some of those summoned had already served on other juries one week earlier. Two members of the jury served on a jury the

---

[1]. Mr.Monterrubio was first represented by counsel retained by the family, Walter Pink of Houston, Texas who withdrew about three months before trial. The trial court then appointed a Mr. Jose Esquivel to represent Mr. Monterrubio but Mr. Esquivel withdrew one month later. In August, 1994, Mr. Afredo Padilla was appointed to represent Mr. Monterrubio. Jury selection started in October, 1994 and two weeks later, Mr. Monterrubio was sentenced to death.

week before, one on a jury for the offense of murder and the other for the offense of aggravated assault. No investigation into potential punishment evidence was conducted by trial counsel. The family was simply called a few days before trial commenced and told to assemble at the court house as witnesses.

After Mr. Monterrubio was convicted, his legal situation get even worse. He was represented on appeal by Arnold Pena, who filed the appellate brief only after a show cause order was issued by the Court of Criminal Appeals that threatened Mr. Pena with contempt of court. The brief filed by Mr. Pena was only thirteen pages long and ignored vital points of error that would have assured Mr. Monterrubio a new trial. Mr. Pena was paid $2500 for his work. The Court of Criminal Appeals affirmed the conviction and death sentence after finding some of the points of error raised to be inadequately briefed.

Mr. Monterrubio's legal posture became even more tenuous when state habeas counsel, Mr. Larry Warner, was appointed. Mr. Warner's state writ of habeas corpus was only three pages long. The allegations of the writ merely set forth bare bones constitutional claims and recited no factual development or legal arguments. Mr. Warner, according to the trial court, never asked for a hearing except on the issue of whether international law forbade the execution of someone who was 17 at the time of the offense. Like Mr. Pena before him,, Mr. Warner ignored a number of issues that would have assured Mr. Monterrubio of a new trial.

On this record, the State of Texas will ask this Court to turn its eye from a manifest miscarriage of justice and deny relief. Mr. Monterrubio hopes that will not happen.[2]

---

[2]. This case has already been before the District Court before. It was originally filed and assigned to Judge Tagle. Mr. Monterrubio filed a motion to abate the proceedings in order to attempt to seek relief in the state courts. That effort proved futile; the state courts dismissed his petition for permission to file a successor writ of habeas corpus. The claims are now exhausted and Mr. Monterrubio, pursuant to Judge Tagle's order, is now refiling in the District Court.

II.

Mr. Monterrubio was denied the effective assistance of counsel on appeal when Mr. Pena failed to raise on direct appeal that Mr. Monterrubio was denied his Sixth Amendment right of cross examination and confrontation. At Mr. Monterrubio's trial, the prosecution knew and conceded on the record that they would have a difficult time corroborating Mr. Monterrubio's confession on the corpus delicti of the offense of capital murder.[3] They sought, over Mr. Padilla's objection,[4] to introduce the confession of Sixto Monterrubio to corroborate Mr. Monterrubio's confession on that element of the corpus delicti of sexual assault. Sixto Monterrubio was never called to testify. The use of Sixto Monterrubio's confession to satisfy a substantive element of the prosecution's burden of proof deprived Petitioner of his Sixth Amendment right to confront the witnesses against him and to cross examine them.

Mr. Pena failed to raise other issues as well. The victim told a friend, Gilbert Alcala, about the Petitioner, that she did not like him and that he was making moves on her. She told Sixto, according to the witness, to make Petitioner stop but he wouldn't. She insisted that Sixto take Petitioner home but he would not; he took her home instead and she was angry. SF-XVI-111-14. Though Mr. Padilla's hearsay objection was overruled, the issue was not raised on appeal.

III.

---

[3]. Under Texas law, as the Court of Criminal Appeals noted in its opinion affirming Mr. Monterrubio's conviction, the corpus delicti of the offense of capital murder is proof of both the homicide and the underlying felony, here sexual assault. The Court of Criminal Appeals found that requirement satisfied by considering the confession of Sixto Monterrubio.

[4]. Mr. Padilla had filed a pretrial motion asking the trial court to exclude Sixto Monterrubio's statement from evidence, alleging that the admission of the statement would violate the Sixth Amendment.

Mr. Monterrubio was also deprived of the effective assistance of counsel at trial for a number of reasons:

1. Under Texas law, the jury venire summoned for jury selection in a capital murder case must be summoned, apart from the venire normally summoned. This special venire requirement, set forth in Art. 34.01, V.A.C.C.P. mandates a party to file a motion to request such a venire. Section 34.01 requires the sheriff of the county to summon as veniremen those citizens who are not summoned for regular jury service. The statute's purpose is to insure a fair jury panel that can consider all issues in a death penalty case. In the case at bar, trial counsel realized that only those citizens summoned for regular jury service were present in the venire. He filed a motion for continuance and pointed out that those jurors who had been summoned had already been the subject of criminal voir dire. In fact, some of the venire had already served as jurors in other criminal cases the week before Mr. Monterrubio's case was called to trial. Laura Becerra actually served as a juror in Mr. Monterrubio's case and had served the week before as a juror in a weapon's case. SF-X-213. Thomas Murphy, the third juror selected in this case, served the week before on an aggravated assault case. Saul Torres served on a murder case the week before; Mr. Padilla exercised a peremptory challenge. The same thing happened with Nilda Perez. Nancy Hinojosa served two weeks before and then served on Mr. Monterrubio's jury. Mr. Padilla failed to simply file a motion demanding that a special venire be summoned. Had he done so, none of this would have occurred.

3. Juror Becerra also posed another problem to the defense. She told Mr. Padilla that were she to find Mr. Monterrubio guilty, that would be tantamount in her mind to a death penalty punishment. In short, she would automatically assess the death penalty were she

to find Mr. Monterrubio guilty. Only if the state failed to prove his connection to the offense would Ms. Becerra not consider the death penalty. Not only did Mr. Padilla not challenge her for cause, he let serve on the jury. SF-X-220.

4. Further, Mr. Padilla's punishment voir dire consisted almost exclusively of asking the venire whether they could consider probation for the lesser included offense of murder. He never asked any questions about the future dangerousness special issue of Art. 37.071, V.A.C.C.P. His sole question directed at mitigation was whether the jury could consider it. He made no other effort to explain either concept to the venire. As noted above, the jury was selected on one week.

5. Mr..Padilla also failed to object to substantial amounts of hearsay. The State's first witness was a friend of the complainant's, Yvette Urie. She testified, without objection, about the complainant's opinion of the Petitioner and his cousin. SF-XVI-58. The complainant, though she thought Mr. Monterrubio a friend, she considered him a creep. Id at 84. The complainant told her of times where Mr. Monterrubio would simply show up in class and stare at her. Id at 87. Gilbert Acala, another friend, told the jury about what the complainant told him she would be doing later the evening of her death. Id at 99. Mr. Alcala told the jury the complainant told him she would go out with Sixto after curfew and that she would party with him and he would get her drugs. Id at 100. She was going to go out with Sixto, Mr. Monterrubio's codefendant and cousin. Id. The same witness testified that the complainant would get drugs from Sixto Monterrubio. Id at 103. Not only did Mr. Padilla not object to the hearsay nature of the evidence but brought it out himself on cross examination. On the one occasion in which he did object as to

hearsay and his objection was sustained, he failed to ask for an instruction to the jury to disregard the testimony. Id at 102.

At the time of the murder, Mr. Acala talked about the complainant's boyfriend, Eddie, who was Sixto Monterrubio. The witness never met Sixto; the complainant only talked about him. None of this testimony elicited a hearsay objection from defense counsel. Id at 100-102.

Delaila Zarate, another friend of the complainant, testified as to what the complainant said about complainants boyfriend, Eddie, Id at 111; that Sixto was Yvette's boyfriend, Id.; that complainant was real good friends with Sixto and trusted him a lot; Id at 112. Defense counsel failed to object to any of this hearsay testimony. The complainant told the witness that she would sneak out of the house every night during the summer; again, defense counsel failed to object to the hearsay. Id at 111. The complainant would sneak out of her house because she trusted Sixto. Id at 112. Once again, after allowing pages and pages of hearsay testimony to come in, defense counsel objects, is overruled and then quits objecting. Id at 113. The witness is allowed to testify that the complainant was angry and that she told the witness that Mr. Monterrubio had tried to make moves on her. Defense counsel finally requested a running objection to Ms. Zarate's testimony as being hearsay and that objection was overruled. Id at 113. Once the objection was overruled, Mr. Padilla made no effort to object to any other hearsay elicited from the same witness, such as that complainant asked Sixto to take Mr. Monterrubio home and was angry that Sixto took her home instead. Id at 116. Mr. Padilla did not object to testimony that Carla called Sixto to ask him for money to buy drugs from a friend of his. Id at 121-122. Testimony from this same witness that Carla told her she

had to get off the phone at 12:30 a.m. because Sixto was supposed to call her and she doesn't want the phone to be busy, also came in without objection. The witness was also allowed to testify that Carla called her back at 2 a.m. and was to come over to her house and that Sixto was to pick her up. Mr. Padilla did not object to any of the hearsay testimony which has been described herein. Neither does Mr. Padilla object to the hearsay within hearsay when the witness testifies about a phone call she got from someone named Sandra Vasquez who was telling the witness about a phone call Ms. Vasquez got from Rosie, the complainant's sister, telling her that they had not found Carla as of noon the next day.

The failure to object to hearsay testimony continued throughout the trial. Julie Ramirez, another witness for the prosecution, testified that the complainant told her Sixto was cool to talk to and that she would sneak out of the house to go out with him. Id at 137. She testified that the complainant told her they would buy beer, drink, smoke cigarettes and hang out. Id. Mr. Padilla not only did not object but then on cross-examination elicited hearsay testimony that the complainant described Sixto as short, chubby and ugly. Id at 148. Defense counsel elicited information from the witness that Carla told her she got marijuana from Sixto. Id at 149. He continued to allow repeated references to Carla's conversations about Sixto's relationship with other people. Id at 150-51.

Defense counsel allowed the testimony of Jorge Homero Hinojosa, the complainant's stepfather, to be admitted without objection. Mr. Hinojosa testified to his step-daughter's character. Id at 154. Mr. Padilla did not object about testimony going into the character of the victim. Mr. Hinojosa presented hearsay testimony about

conversations with complainant's friends and that the family found out complainant was supposed to be with Sixto but he was at a party in Mexico. Id at 161. Mr. Hinojosa was allowed to testify as to his own conversation with Sixto. Id at 162. He was able to describe going with the Chief of Police of Los Fresnos to visit Sixto and the conversation between Sixto and the Chief of Police. Id at 162. He told of his conversations with various people who tried to swindle him out of a reward he offered. Id at 166. He talked about his conversation with the Brownsville Chief of Police regarding finding complainant's body and the condition of the body. Id at 171. Mr. Padilla did not object to any of the hearsay testimony. Nor was Mr. Padilla moved to object as to hearsay when Mr. Hinojosa described the conversations of his own investigator with Sixto. Id at 167. Instead, Mr. Padilla gets Mr. Hinojosa on cross examination and has him testify that the investigator found out Sixto was in college. Id at 175.

In addition to failing to object to extreme prejudicial and harmful hearsay testimony, Defense counsel failed to object to the admission of victim impact testimony at the guilt stage. Id at 152-176. Complainant's stepfather testified about the effect of Carla's disappearance on her mother. Id at 170. He testified about the efforts to find Carla and the effect it had on him. Id at 164. He testified that people tried to swindle him out of the reward. Id.. He talked about the effect that it had on him looking for his daughter in whore houses. Id.
Mr. Padilla did not object to any of that testimony coming in at the guilt-innocence phase of the trial. Nor did he object when Mr. Hinojosa testified that he helped rescue another young woman who looked like his step-daughter. Id at 165.

6. Finally, Mr. Padilla presented no evidence at the punishment phase that would justify a sentence less than death. The state stipulated that Mr. Monterrubio had no criminal history and put on no evidence that he had ever broken the law at all. Except for victim impact evidence, they put on no other evidence that would justify the death sentence and relied solely on the admittedly brutal nature of the offense. Mr. Padilla called members of the family a few days before the trial started and told them to bring witnesses to testify for Mr. Monterrubio. Mr. Monterrubio's grandmother and mother testified about the Petitioner. A neighbor testified that the codefendant, Sixto, would bring Mr. Monterrubio over to her house to see her daughters. One of her daughters testified for Mr. Monterrubio but was forced to admit on cross examination that she had lied to the police in order to protect Sixto Monterrubio.

The record reflects a significant amount of mitigating evidence available to the defense without any investigation at all. As noted above, Mr. Monterrubio was represented by two lawyers before Mr. Padilla. One of those lawyers, Walter Pink, conducted a motion to suppress hearing attempting to suppress Mr. Monterrubio's confession. At that hearing, one officer, Officer Pineda, testified that, in his opinion, the Petitioner was under the control or domination of his older cousin, Sixto, the codefendant. Sixto was five to six years older than the Petitioner. Further, Mr. Padilla failed to bring forth any expert testimony about the likelihood of Mr. Monterrubio's committing an act of violence in the future.

IV.

Mr. Monterrubio's Fifth Amendment right against self incrimination was violated when the police failed to recognize his invocation of the right to counsel. The police picked up Mr.

Monterrubio and asked him to come to the police station. Though he was not under arrest, they did give him his **Miranda** warnings. At one point, Mr. Monterrubio told an officer to tell his uncle, Sixto Monterrubio Sr. to get a lawyer for him, if he needed one. The officer relayed that information to the uncle.[5] Officer's Lucio and Pineda interrogated Mr. Monterrubio. While they at first, claimed to have no suspicion of Mr. Monterrubio's involvement in the murder of Carla Villareal. At one point, however they became very suspicious when Mr. Monterrubio became very nervous and gave contradictory statements. At this point, Appellant was in custody for Fifth Amendment purposes. Officer Lucio then went to Sixto, Sr. the uncle and asked him to speak to Petitioner to get Petitioner to tell them the truth about what occurred. See SF-III-57. See also SF-XVII-386. Before the uncle was brought upstairs to see Petitioner, the Petitioner asked Officer Lucio to ask his uncle to get him an attorney, if he needed one. Id at 387. See also Id at 58. The officer did as he was asked. Sixto, Sr. then told the Petitioner to tell the truth and "whoever may fall, you just tell the truth." "Caigan quien caigan. Tu digas la verdad," Id at 57.

Though the invocation of counsel was vague, the police should have limited their subsequent questioning to clarifying his request for counsel, to determining whether he in fact, wanted counsel or wanted to continue talking.

V.

The evidence is insufficient to sustain the jury's affirmative answer to the future dangerousness special issue. Though the offense was indeed a brutal one, the defendant, 17 years old at the time of the offense, had never been convicted of a crime before and had never

---

[5]. The Court of Criminal Appeals ruled that the information was never given to the police and that Petitioner had simply told his uncle that he wanted him to secure an attorney if he needed one. "Appellant's request to his uncle and his uncle's response are a private matter involving no state action." See footnote 6, page 4, Opinion of Court of Criminal Appeals. The Court was simply wrong.

committed a criminal offense of any kind. No psychiatric evidence was brought forth to sustain the allegation and no character evidence of any kind was admitted to justify the affirmative answer.

Respectfully submitted,

Michael B. Charlton
1744 Norfolk
Houston, Texas 77098
(713) 572 2333
(713) 572 2483 (fax)
State Bar of Texas 04144800
COUNSEL FOR JOSE IGNACIO MONTERRUBIO


Elisa Vasquez
613 19th Street
Galveston, Texas 77550
(409) 763 2131
(409) 763 4104
State Bar of Texas 20502100
COUNSEL FOR JOSE IGNACIO MONTERRUBIO

## CERTIFICATE OF SERVICE

This is to certify that a copy of this Amended Writ of Habeas Corpus was served on opposing counsel, Tina Dettmer, of the Texas State Attorney General's Office, P.O. Box 12548, Austin, Texas 78711 by mailing a copy of same on September 18, 2002.

Michael B. Charlton