**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE**
**SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

United States District Court
Southern District of Texas
FILED

JAN 0 6 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JOSE IGNACIO MONTERRUBIO, | X | |
| PETITIONER | X | |
| V. | X | CAUSE NO. 02-CV-204 |
| | X | |
| JANIE COCKRELL, Director | X | |
| Institutional Division, Texas | X | |
| Department of Criminal Justice | X | |

## SUMMARY JUDGMENT RESPONSE

Comes now the Petitioner, Jose Ignacio Monterrubio to file this summary judgment response and to grant him his requested habeas corpus relief for the reasons set forth below:

I.

Mr. Monterrubio is a death sentenced inmate whose petition for writ of habeas corpus is currently pending in this Court. Ms. Cockrell has filed a motion for summary judgment to which Mr. Monterrubio responds.

### II. Summary of the Response

Mr. Monterrubio concedes that his claims regarding ineffective assistance of appellate counsel are procedurally default but argues that he can establish cause and prejudice for that default. The underlying claim that appellate counsel failed to address, the Sixth Amendment claim, was so meritorious and so obvious that the failure to address it is a gross deviation from the level of advocacy expected of a criminal law practitioner. Further, its merit was such that a new trial would almost certainly have been assured.

*Monterrubio Summary Judgment Response*
*January 3, 2003 p. 1*

As noted in the petition, Mr. Monterrubio was convicted, in 1994, of capital murder in Cause no. 93-CR-1756-B in the 138th District Court of Cameron County, Texas and sentenced to death. The trial lasted only two weeks. He was then a 17 year old boy who had never been convicted of any other criminal offense and had never participated in any criminal activity. His trial lasted a total of two weeks, including jury selection. He was represented by a lawyer who had been his lawyer for only two months and was paid the sum of $5000.00 to represent him.[1] The jury was picked in five days and was selected, not from a special venire as required by Texas law, but from a jury pool which had already been the subject of criminal voir dire. Some of those summoned had already served on other juries one week earlier. Two members of the jury served on a jury the week before, one on a jury for the offense of murder and the other for the offense of aggravated assault. The prosecution, over defense counsel's objection, was permitted to introduce the confession of the codefendant, without calling him to the stand for cross examination. No investigation into potential punishment evidence was conducted by trial counsel. The family was simply called a few days before trial commenced and told to assemble at the court house as witnesses.

After Mr. Monterrubio was convicted, his legal situation get even worse. He was represented on appeal by Arnold Pena, who filed the appellate brief only after a show cause order was issued by the Court of Criminal Appeals that threatened Mr. Pena with contempt of court.

---

[1]. Mr. Monterrubio was first represented by counsel retained by the family, Walter Pink of Houston, Texas who withdrew about three months before trial. The trial court then appointed a Mr. Jose Esquivel to represent Mr. Monterrubio but Mr. Esquivel withdrew one month later. In August, 1994, Mr. Afredo Padilla was appointed to represent Mr. Monterrubio. Jury selection started in October, 1994 and two weeks later, Mr. Monterrubio was sentenced to death.

The brief filed by Mr. Pena was only thirteen pages long and ignored vital points of error that would have assured Mr. Monterrubio a new trial, including the denial of Mr. Monterrubio's right of cross examination. Mr. Pena was paid $2500 for his work. The Court of Criminal Appeals affirmed the conviction and death sentence after finding some of the points of error raised to be inadequately briefed.

Mr. Monterrubio's legal posture became even more tenuous when state habeas counsel was appointed. The state writ of habeas corpus was only seven pages long. The allegations of the writ merely set forth bare bones constitutional claims and recited no factual development or legal arguments. State habeas counsel, according to the trial court, never asked for a hearing except on the issue of whether international law forbade the execution of someone who was 17 at the time of the offense. The state habeas judge found most of the claims inadequately presented so that it was impossible for the Court to decide the merits of Mr. Monterrubio's claims. [2] Like Mr. Pena before him, state habeas counsel ignored a number of issues that would have assured Mr. Monterrubio of a new trial.

### III. The Sixth Amendment claim

Mr. Monterrubio concedes that his claim of ineffective assistance of appellate counsel is procedurally defaulted but insists that he can establish cause and prejudice. As noted above, Arnold Pena was appointed by the state trial court to represent Mr. Monterrubio on appeal. Mr. Pena delayed so long in filing the brief that the Texas Court of Criminal Appeals threatened to

---

[2]. State habeas counsel raised two claims in a supplemental filing but those two claims were also dismissed because counsel had failed to establish sufficient facts to prove those allegations.

*Monterrubio Summary Judgment Response*
*January 3, 2003 p. 3*

hold him in contempt of court for failing to honor the duties of his appointment.

The brief filed by Mr. Pena was only thirteen pages long for which Mr. Pena was paid $2500.00. Mr. Monterrubio did not even receive a $2500.00 brief.

Mr. Monterrubio was denied the effective assistance of counsel on appeal when Mr. Pena failed to raise on direct appeal the issue of Mr. Monterrubio's denial of his Sixth Amendment right of cross examination and confrontation. At Mr. Monterrubio's trial, the prosecution knew and conceded on the record that they would have a difficult time corroborating Mr. Monterrubio's confession on the corpus delicti of the offense of capital murder. [3] They sought, over trial counsel's, Mr.Alfredo d Padilla's objection,[4] to introduce the confession of Sixto Monterrubio to corroborate Mr. Monterrubio's confession on that element of the corpus delicti of sexual assault.[5] Sixto Monterrubio was never called to testify. The use of Sixto Monterrubio's confession to satisfy a substantive element of the prosecution's burden of proof deprived Petitioner of his Sixth Amendment right to confront the witnesses against him and to cross examine them. The failure of appellate counsel to raise that issue, additionally deprived the defendant of this Sixth Amendment right to counsel. The factual scenario, thus presents two

---

[3]. Under Texas law, as the Court of Criminal Appeals noted in its opinion affirming Mr. Monterrubio's conviction, the corpus delicti of the offense of capital murder is proof of both the homicide and the underlying felony, here sexual assault. The Court of Criminal Appeals found that requirement satisfied by considering the confession of Sixto Monterrubio.

[4]. Mr. Padilla had filed a pretrial motion asking the trial court to exclude Sixto Monterrubio's statement from evidence, alleging that the admission of the statement would violate the Sixth Amendment.

[5]. Sixto Monterrubio was Petitioner's cousin and codefendant; at the time of the offense, he was almost five years older than Petitioner. He was ultimately sentenced to life imprisonment.

issue to this Court: the denial of the Sixth Amendment right of cross examination and the Sixth Amendment right to effective assistance of appellate counsel.

Mr. Pena failed to raise other issues as well. The victim told a friend, Gilbert Alcala, about the Petitioner, that she did not like him and that he was making moves on her. She told Sixto, according to the witness, to make Petitioner stop but he wouldn't. She insisted that Sixto take Petitioner home but he would not; he took her home instead and she was angry. SF-XVI-111-14. Though Mr. Padilla's hearsay objection was overruled, the issue was not raised on appeal.

## A. Procedural default

As noted, these claims are procedurally defaulted. To obviate the effect of that default, Mr. Monterrubio must establish both cause and prejudice. Cause lacks any precise definition but generally means some objective factor external to the defense that impeded counsel's efforts to raise the claim. See **Murray v Carrier**, 477 U.S. 478 (1986). This has included state official interference, **Dobbs v Zant**, 506 U.S. 357 (1993) ( state official's assertion that final arguments had not been transcribed prevented counsel from securing transcripts); or that the factual or legal basis for the claim was not reasonably available to counsel at the time of the default, **Coleman v Thompson**, 501 U.S. 711 (1991). Ineffective assistance of counsel is such a cause **ONLY if** there is a constitutional requirement for effective assistance for a particular proceeding. See **Murray v Carrier** supra; **Coleman v. Thompson** supra. Mr. Monterrubio concedes that the Fifth Circuit has decided his argument adversely. See **Irving v Hargett**, 59 F.3d 23, 26 (5th Cir. 1995); **In re Goff**, 250 F.3d 273, 275 (5th Cir. 2001); **Martinez v Johnson**, 255 F.3d 229, 240 (5th Cir. 2001).

In the state habeas action, appointed counsel filed only a seven page writ of habeas corpus which failed to meet even minimal standards for state writs of habeas corpus. It contained only boiler plate allegations of constitutional violations with no factual or legal development. State habeas counsel, according to the trial court, never asked for a hearing except on the issue of whether international law forbade the execution of someone who was 17 at the time of the offense. The state habeas judge found most of the claims inadequately presented so that it was impossible for the Court to decide the merits of Mr. Monterrubio's claims. [6] Like Mr. Pena before him, state habeas counsel ignored a number of issues that would have assured Mr. Monterrubio of a new trial.

There can be little question of the futility of Mr. Monterrubio's state habeas pleadings. In **Ex parte Maldonado**, 688 S.W.2d 114 (Tex.Crim.App. - 1985) the Court entered the following order:

> In a postconviction collateral attack, the burden is on the
> Applicant to allege and prove facts which, if true, entitle him
> to relief. In the context of an allegation of an egregiously
> erroneous charge, one which rises to the level of having denied
> the applicant a fair and impartial trial, this requirement of
> pleading will be strictly pursued. In other words, it is not
> sufficient that the petition alleges the denial of a fair and
> impartial trial or due process of law, which are mere
> conclusions of law; neither is it adequate to allege the bare
> fact that the court's charge was somehow erroneous.
>
> Rather, the applicant must allege the reasons a given error
> in the charge, in light of the trial as a whole, so
> infected the procedure that the applicant was denied a fair and

---

[6]. State habeas counsel raised two claims in a supplemental filing but those two claims were also dismissed because counsel had failed to establish sufficient facts to prove those allegations.

impartial trial.  Once alleged, the burden on the applicant to
prove such a denial is heavy and cannot be carried by merely
attaching a certified copy of the court's charge to the
application for writ of habeas corpus, as was done here.

The application before us utterly fails to allege facts
which, if true, entitle the applicant to collateral
relief; the application is accordingly dismissed.  This
dismissal is without prejudice to applicant's right to replead
and support this allegation with adequate reasoning, argument
and testimonial and recorded evidence which illustrates the
error so infected the trial process as to deny him a fair and
impartial trial.

**Ex parte Maldonado**, 688 S.W.2d at 116.

See also **Ex parte Shook**, 59 S.W.3d 174, 176 (Tex.Crim.App. - 2001)(dissenting

opinion, PJ Keller); **Ex parte McPherson**, 32 S.W.3d 860 (Tex.Crim.App. - 2000)("Applicant

contends that his trial counsel was ineffective because he failed to file various pretrial motions,

including a motion in limine, a motion for speedy trial, a motion to quash, and a motion for

appointment of an investigator.  Applicant does not allege any specific facts showing why these

motions were  needed in this particular case.  Applicant also argues that his counsel failed to

object to inadmissible evidence, but again he states only conclusions without any supporting

facts. Therefore, Applicant has failed to allege facts which, if true, would entitle  him to relief")

**Ex parte San Migel**, 973 S.W.2d 310, 311 (Tex.Crim.App. 1998) ("It is not sufficient for a

habeas petition to allege the denial of a fair and impartial trial or due process of law, which are

mere conclusions of law."); **Ex parte Dutchover**, 779 S.W.2d 76, 77 (Tex.Crim.App. - 1989)

("Furthermore, applicant fails to allege facts showing in  context of his particular trial the **Long**

error was not harmless beyond a reasonable doubt."); **Ex parte Freeman**, 778 S.W.3d 874

(Tex.App. - Houston 1, 1989) ("Because appellant did not state facts that would entitle him to

relief, the trial court correctly refused to hear evidence on the issue of ineffective

assistance of counsel.") **Ex parte Lopez** 745 S.W.2d 29 (Tex.Crim.App. - 1988)( dissenting

opinion, PJ. Onion, ""In my opinion the applicant has not alleged and proved facts which, if true,

would entitle him to relief. (citation omitted)  I would dismiss the application without

prejudice to applicant's right to replead and support his  allegations "with adequate reasoning,

argument, and testimonial and recorded evidence," which illustrates, if it does, that he  was

denied the effective assistance of counsel following remand.").

Though the Fifth Circuit has ruled against his claim, see above,  the issue is not as clear

as the Fifth Circuit would hold.

**Coleman** itself presents two openings.  First, **Coleman** is predicated on the absence of a

Sixth Amendment guarantee to the assistance of counsel in post conviction proceedings. 501

U.S. at 754:

> Where a petitioner defaults a claim as a result of the denial of the right to effective
>
> assistance of counsel, the State, which is responsible for the denial as a constitutional
>
> matter, must bear the cost of any resulting default and the harm to state interests that
>
> federal habeas review entails.  A different allocation of costs is appropriate in those
>
> circumstances **where the State has no responsibility to ensure that the petitioner was**
>
> **represented by competent counsel.**  As between the State and the petitioner, it is the
>
> petitioner who must bear the burden of a failure to follow state procedural rules. In the
>
> absence of a constitutional violation, the petitioner bears the risk in federal habeas for all
>
> attorney errors made in the course of the representation. . . . (citation omitted).

Id.

There can be little doubt that competent counsel to represent Mr. Monterrubio was contemplated by state habeas counsel's appointment herein. Article 11.071 of the Texas Code of Criminal Procedure took effect on September 1, 1995 and ordered the Texas Court of Criminal Appeals "under rules and standards adopted by the court, [to] appoint competent counsel" to indigent death row inmates for state post-conviction appeals. TEX. CODE CRIM. PROC. Art. 11.071 § 2(d). Such counsel, the statute provided, "shall investigate expeditiously...the factual and legal grounds for the filing of an application for a writ of habeas corpus." *Id.* § 3(a). The State of Texas is clearly responsible for providing effective counsel and, consequently, for Mr. Monterrubio's procedural default and must bear its costs.

Secondly, **Coleman** did not resolve the issue of whether a prisoner is entitled to the effective assistance of state habeas counsel if "state collateral review is the first place a prisoner can present a challenge to his conviction." Id at 755. See also **Daniels v United States**, 532 U.S. 374 (2001)( Justice Scalia concurring - "We have left open the question whether such ineffective assistance can establish a constitutional violation," citing **Coleman**). In Texas, claims of ineffective assistance of trial counsel are to be raised by post-conviction writ of habeas corpus. **Ex parte Torres**, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997). In **Thompson v. State**, 9 S.W.3d 808, 813-14 (Tex. Crim. App. 1999), a non-capital case, the Court of Criminal Appeals held that only "[r]arely" will an appellate court possess an adequate record to fairly evaluate the claim. In the vast majority of cases, the undeveloped record on direct appeal will be insufficient for an appellant to satisfy both prongs of Strickland. See also **Jackson v. State**, 877 S.W.2d 768 (Tex.Cr.App. 1994)(concurring opinion JJ. Baird and Overstreet, "... appellate counsel would be well advised, and appellants would be better served, if claims of ineffective assistance of counsel

*Monterrubio Summary Judgment Response*
*January 3, 2003 p. 9*

were not raised on direct appeal but rather in applications seeking habeas corpus relief").

Further, the Art. 11.071 proceeding was Mr. Monterrubio's first practicable opportunity to raise ineffective assistance of counsel on appeal. Mr. Pena, the appointed appellate counsel, cannot be expected to meaningfully challenge his own misconduct. A meaningful challenge based on ineffective assistance of appellate counsel was not likely to occur. See **Alston v Garrison**, 720 F.2d 812, 816 (4th Circ. 1983) ("where, as here, the defendant's trial lawyer also prosecuted the appeal, it is obvious that ineffective assistance of counsel is not likely to be raised at trial or to appear among the assignments of error."). See also **Kimmelman v Morrison**, 477 U.S. 365, 378 n.3 (1986) (as a general rule, "no . . . meaningful opportunity exists for the . . . fair litigation of a habeas petitioner's ineffective-assistance claims at trial and on direct review." )

While deciding that Coleman did receive effective assistance of counsel at the trial level stage of habeas corpus, [7] the Court noted that where the merits of the one and only appeal an indigent has as of right are decided without benefit of counsel, an unconstitutional line has been drawn between rich and poor. 501 U.S. at 756, quoting from **Douglas v California**, 372 U.S. 353, 357 (1963).

> Coleman has had his "one and only appeal," if that is what a state collateral proceeding may be considered; the Buchanan County Circuit Court, after a two day evidentiary hearing, addressed Coleman's claims of trial error, including his ineffective assistance of counsel claims. What Coleman requires here is a right to counsel on appeal from that determination. Our case law will not support it.

501 U.S. at 756. Mr. Monterrubio has not had his one and only appeal where ineffective assistance of appellate counsel could be effectively challenged because of state habeas counsel's

---

[7]. The issue before the Court in **Coleman** was whether Coleman's counsel had rendered effective assistance of counsel by failing to timely file a notice of appeal.

indifference to his rights. See e.g. **Griffin v Delo**, 961 F.2d 793 (8th Cir. 1992) (case remanded for consideration of whether attorney who represented the pro se petitioner in state and federal post conviction remedies was ineffective for failing to raise certain claims including ineffective assistance of trial and appellate counsel and for failing to adequately address other issues).   See also **Weekley v Jones**, 927 F.2d 382, 386-87 (8th Cir. 1991).

There can be little doubt of the importance of post conviction review of death cases. For example, prosecutorial misconduct is often not detected at trial, since it frequently involves successful suppression of relevant information by state officials during trial.  In **Amadeo v. Zant**, 486 U.S. 214, 224 (1988), the petitioner's conviction was reversed on the basis of a damning prosecution memorandum discovered by volunteer habeas counsel during an  extra-record investigation of "20 to 30 years' worth of jury lists."  In **Kyles v. Whitley**, 514 U.S. 419, 422  (1995), it was not until state postconviction proceedings that counsel was "first able to present certain evidence, favorable to Kyles, that the State had failed to disclose before or during the trial."  In **Kirkpatrick v. Whitley**, 992 F.2d 491, 496 n.22 (5th Cir. 1993), **Brady** material was discovered by volunteer capital habeas counsel when a police official offered it in response to counsel's requests for relevant extra-record information. See also **Guerra v. Johnson**, 916 F. Supp. 620 (S.D. Tex. 1995), *aff'd,* 90 F.3d 1075 (5th Cir. 1996) (the fact that testimony underpinning the capital conviction was influenced by threats, improper coaching of witnesses, and suppression of prior inconsistent statements remained undiscovered until state postconviction proceedings).  To deny effective counsel at some important a stage of capital proceedings is to run a very real risk of the execution of a person unfairly tried and convicted.

Finally, a number of state jurisdiction have recognized, either as a matter of due process,

or as a matter of state statutory law, the right to effective habeas counsel. **State v. Velez**, 746

A.2d 1073 (N.J. Super.Ct. 2000); **Ivoieno v Commissiner of Correction**, 699 A.2d 1003 (Conn.

1997); **People v Johnson**, 609 N.E. 2d 304 ((ll. 1994); **Waters v. State**, 574 N.E.2d 911 (Ind.

1991); **People v Butler**, 541 N.E. 2d. Ill.App. Ct. 1989); **Jackson v Weber**, ___ N.W.2d ___,

2001 WL 1426700 (S.D. Nov. 2001); **Commonwealth v Albrecht**, 720 A.2d 693 (PA. 1998);

**Olive v Maas**, ___ So. 2d ___ (#SC00-317 Fla, Feb. 14, 2002); **Spaulding v Dugger**, 526 So.2d

71 (Fla 1988) ( as a matter of Florida statutory law).

The Sixth Amendment is not the only basis from which this Court can infer a duty to

provide effective state counsel. As noted above, due process compels that result. Although the

United States Supreme Court has been clear that there is no protected Sixth Amendment right to

counsel under the United States Constitution in state post-conviction proceedings, **Murray v.**

**Giarratano** 492 U.S. 1 (1989), "when a State opts to act in a field where its action has

significant discretionary elements, it must nonetheless act in accord with the dictates of the

Constitution -- and, in particular, in accord with the Due Process Clause." **Evitts v. Lucey**, 469

U.S. 387, 401 (1985). The State of Texas has opted to provide post-conviction review of death

sentences under Article 11.071 of its Code of Criminal Procedure, and has guaranteed the

appointment of competent counsel under Article 11.071 §2. Since it has chosen to provide these

statutory rights, the State of Texas must provide them in accordance with due process. See

**Evitts**, 469 U.S. at 387.

The federal courts have long recognized a right to due process in Texas post-conviction

proceedings. In **Welch v. Beto**, the United States Court of Appeals for the Fifth Circuit plainly

stated this right: "*Having invoked Texas statutes granting post-conviction hearings, Welch had the right to be tried according to the substantive and procedural due process requirements of the Fourteenth Amendment*." **Welch v. Beto**, 355 F.2d 1016, 1020 (5ᵗʰ Cir.), *cert. denied*, 385 U.S. 839 (1966) (emphasis added). In **Welch**, a death-sentenced inmate requested a post-conviction hearing regarding his sanity to proceed on appeal, pursuant to then TEX. CODE CRIM. PROC. art. 932 (b)§ 3. *See id.* at 1018.[8] He presented, in affidavit form, the evidence of his insanity -- all of which had been presented to the jury at trial. *Id.* at 1018.[9] The state presented no evidence to refute Welch's affidavit, but merely contended that the evidence was the same as that which the jury rejected at trial. *Id.* The trial court refused to hold a hearing before a jury. *Id.*

Although the Fifth Circuit recognized that no new evidence of the inmate's insanity had been produced, the Court held that the judge's failure to hold a hearing in the absence of any evidence presented by the state was a violation of the statute and therefore a violation of due process. The **Welch** Court did not consider whether a new hearing would have been likely to produce a different result, but rather based its grant of relief solely on the denial of process. *Id.*

The United States Supreme Court has also stated that the right to due process extends to state post-conviction proceedings such as Mr. Monterrubio's Article 11.071 proceeding. In **Case**

---

[8]     The Texas statute allowed for the empanelment of a jury and a hearing on sanity during a criminal defendant's appeal of a conviction if the judge of the convicting court found a reasonable doubt as to the sanity of the defendant. *See id.* at 1018 n. 2.

[9]     A jury considered Mr. Welch's sanity at his original trial. *Id.* After a psychiatrist testified that Mr. Welch was insane, the state then presented the testimony of the local medical doctor and two lay witnesses who expressed their view that Mr. Welch was sane. The jury found him sane and he was convicted and sentenced to death. *Id.*

**v. Nebraska**, 381 U.S. 336, 337 (1965), the Court granted review in a Nebraska case where an inmate challenged his guilty plea and the State of Nebraska's post-conviction remedy did not apply to his case. The Court granted certiorari "to decide whether the Fourteenth Amendment requires that the States afford prisoners some adequate corrective process for the hearing and determination of claims of violation of federal constitutional guarantees." *Id.* Although the Court never reached the issue because of an intervening change in the Nebraska statute, the Court's action was a clear recognition of a right to some form of due process.

More recently, in **Ohio Adult Parole Authority v. Woodard**, 523 U.S. 272 (1998), the Court discussed a post-conviction right to due process in the context of clemency proceedings. A plurality of the Court held that there is, at least, a minimal right to due process of law in executive clemency proceedings.[10] Justice O'Connor's concurrence in the case explains that, "although it is true that pardon and commutation decisions have not traditionally been the business of the Courts . . . some minimal procedural safeguards apply to clemency proceedings." *Id.* at 289 (internal citations omitted). The obvious implication of this statement is that matters such as post-conviction habeas proceedings, which are traditionally within the purview of the courts, require a significantly greater attention to due process. Even Justice Rehnquist's opinion announcing the judgment, but joined by only three members of the Court, distinguished clemency from other features of the criminal justice process:

> Clemency proceedings are not part of the trial or even the adjudicatory process.
> They do not determine guilt or innocence, and are not intended primarily to

---

[10]    Five justices of the United States Supreme Court held that a right to due process in clemency proceedings exists. *See Woodard*, 523 U.S. at 288-89 (O'Connor, J., concurring, joined by Souter, Ginsberg, and Breyer, JJ.); *id.* at 290 (Stevens, J., dissenting).

> enhance the reliability of the trial process. They are conducted by the Executive
> Branch, *independent of direct appeal and collateral relief proceedings.*

*Id.* at 284 (emphasis added). Justice Stevens addressed the question directly in his dissenting

opinion, stating:

> If there could be any question whether state postconviction proceedings are
> subject to due process protections, our unanimous opinion in Yates v. Aiken, [484
> U.S. 211, 217-218, (1988)], makes clear that they are.

*Id.* at 293 n.3. This review of cases demonstrates the courts' longstanding recognition of a robust

right to due process in state post-conviction proceedings.

Mr. Monterrubio's due process rights were ignored in the state habeas proceedings. He

was so abysmally represented that all of his claims were forfeited.

## B. An Inadequate State ground

For a procedural default to operate as a bar to habeas corpus relief in federal court, it must

be both an independent state ground, that is rest on a state law ground that is independent of

federal law and an adequate bar, that is, adequate to support the judgment. **Coleman v**

**Thompson** supra at 729.

In **Lee v Kemna**, 534 U.S. 362 (2002), the Court stated that ordinarily, the violation of a

firmly established and regularly followed state rule forecloses federal review. "There are,

however, exceptional cases in which exorbitant application of a generally sound rule renders the

state ground inadequate to stop consideration of a federal question." It is admittedly a small

category of cases.

Violations of due process can place a habeas case in that small category. In **Reece v**

**Georgia**, 350 U.S. 85 (1955), Georgia law required a defendant, who wished to challenge the

composition of the grand jury that indicted him, to raise that challenge before indictment; in Reece's case, he was not appointed counsel until after indictment. He filed his grand jury challenge before arraignment. Finding a requirement of effective assistance of counsel in these circumstances in the due process clause, 350 U.S. at 90, the Court ruled that the state of Georgia should have considered Reece's claim on the merits, because he had absolutely no opportunity to present these issues before counsel was appointed. In **Brinkerfoff-Faris v Hill**, 281 U.S. 673 (1930), the Court held that the due process clause mandated that the State, either through its judiciary or its legislature, could not deprive a person of all existing remedies for the enforcement of a right. See also **Alburquerque v. Bara**, 628 F.2d 767 (2nd Cir. 1980) (concurring opinion, J. Breiant).

Mr. Monterrubio has set forth his due process argument above. Briefly, it is that when a state statute promises a certain procedure, here, the appointment of competent state habeas counsel, it is a violation of due process to renege on that guarantee. Such a violation places Mr. Monterrubio in that small category of cases where the state procedural bar is not an adequate basis for denying federal review.

## C. Claim on the Merits

Ms. Cockrell argues Mr. Monterrubio's Sixth Amendment claim is without merit; the statement of Sixto Monterrubio was admissible against Petitioner. This argument ignores the effect of **Lilly v Virginia**, 527 U.S. 116 (1999). There the Supreme Court held that "our cases consistently have viewed an accomplice's statements that shift **or spread** the blame to a criminal defendant as falling outside the realm of those 'hearsay exceptions' [that are] so trustworthy that

adversarial testing can be expected to add little to [ the statements'] reliability." **Lilly v Virginia**, supra citing **White v. Illinois**, 503 U.S. 346, 357 (1992).  Further, the Court ruled that it was "highly unlikely that the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted when the statements are given under conditions that implicate the core concerns of the old *ex parte* affidavit practice – that is, when the government is involved in the statements production, and when the statements describe past events and have not been subjected to adversarial testing."

The Court  "squarely rejected" the concept that evidence corroborating the out of court statement's truth might supply the necessary "guarantees of trustworthiness." **Lilly v. Virginia** citing **Idaho v. Wright**, 497 U.S. 805 (1990).  The standard is that set forth in **Idaho v. Wright**:: reliability is a factor that should be determined from the totality of the circumstances but **the only relevant circumstances are those surrounding the making of the statement that make the declarant worthy of belief**.  In other words, the declarant's truthfulness must be so clear from the surrounding circumstances of the statement's making that the test of cross-examination would be of marginal utility. Id.   In short, the Court rejected the very analysis Ms. Cockrell attempts to make here: that the statement is reliable because it is corroborated by other evidence. There is no evidence surrounding the making of the statement that would suggest it was reliable.

Even if **Lilly** is of no help to Mr. Monterrubio because its date of decision was after Mr. Monterrubio's appeal was submitted, prior case law dictated the same result.  As evidence of that, this Court need only refer to the Fifth Circuit's opinion in **U.S. v. Flores**, 985 F.2d 770 (5th

Cir. 1993) decided before Mr. Monterrubio's trial. [11] The Court's reasoning is instructive on this point and will be quoted from extensively:

> The **[Idaho v. ]Wright** [supra] court determined that Idaho's residual exception to the hearsay rule was not a firmly rooted exception so that evidence may only be admitted under that exception if it had "particularized guarantees of trustworthiness." Similarly, a confession by an accomplice inculpating a defendant that is being offered as a declaration against penal interest is not a firmly rooted exception. Although some statements that fall within the declaration against penal interest concept may be inherently reliable, the concept itself "defines too large a class for meaningful Confrontation Clause analysis." **Lee v. Illinois**, 476 U.S. 530, 544 n. 5, 106 S.Ct. 2056, 2064 n. 5, 90 L.Ed.2d 514 (1986). Therefore, each class of statements that falls within the exception must be analyzed to determine whether it is inherently reliable. Confessions of accomplices or codefendants are "presumptively unreliable as to the passages detailing the defendant's conduct or culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another." Id. 476 U.S. at 545, 106 S.Ct. at 2064.
>
> Navarro's grand jury testimony is a confession of a codefendant, and it may only be admitted against Flores if the relevant circumstances "that surround the making of the statement ... render the declarant particularly worthy of belief." **Wright**, 497 U.S. at 819, 110 S.Ct. at 3148. However, the district court considered corroborating evidence in addition to the circumstances surrounding the making of the statement. This situation resembles **United States v. Gomez-Lemos**, 939 F.2d 326 (6th Cir. 1991), where two co-conspirators' grand jury testimony was used against the defendant at trial. The testimony was admitted as a declaration against penal interest, the co-conspirators having made themselves unavailable by evoking their Fifth Amendment privilege not to testify. The Court held, under **Wright**, that the district court committed error in admitting the grand jury testimony because it "found significant in its reliability analysis the fact that the hearsay testimony of co-conspirators Barraza and Osorio was corroborated." Id. at 332. Since the district court, contrary to *Wright*, considered corroborating evidence in support of its decision to admit Navarro's testimony, its decision may not stand. [16]

After overruling its prior precedent, allowing such testimony, the Court reasoned:

> Moreover, we believe that the type of evidence here considered should be deemed inadmissible in light of the historical underpinnings and core values of the Confrontation

---

[11]. In **Flores**, the Government used the grand jury testimony of a codefendant who later invoked his Fifth Amendment right not to testify and was thus, unavailable under Fed.R.Evid. 804.

Clause, and what we view as the infringement of those values in this general context by the evolutionary expansion of the concepts of unavailability and declaration against penal interest.

The Court then discussed extensively the historical development of both the concept of

unavailability and the declaration against penal interest.

The **Donnelly** court considered whether the confession of a third party exculpating the defendant should be admitted as evidence. *Id.* 228 U.S. at 271, 33 S.Ct. at 459. The Court determined that it should not, because although a recognized exception to the hearsay rule existed concerning declarations against interest, "it is almost universally held that this must be an interest of a pecuniary character... In this country there is a great and practically unanimous weight of authority in the state courts against admitting evidence of confessions of third parties...." *Id.* 228 U.S. at 273-274, 33 S.Ct. at 459-60. **Donnelly** also relied on **Sussex** and on Justice Marshall's opinion in **Queen v. Hepburn**, 11 U.S. (7 Cranch) 290, 3 L.Ed. 348 (1813), which observed, "The danger of admitting hearsay evidence is sufficient to admonish courts of justice against lightly yielding to the introduction of fresh exceptions to an old and well-established rule; the value of which is felt and acknowledged by all." *Id.* 11 U.S. (7 Cranch) at 296, 3 L.Ed. at 350.

. . . .

Although rule 804 does not specifically address the situation where the third-party declarant's confession contains statements inculpating the defendant, the Supreme Court has always viewed such statements as inherently suspect. **Douglas v. Alabama**, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965) (admission of nontestifying previously tried codefendant's confession violated the defendant's rights under the Confrontation Clause); **Bruton v. United States**, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (admission of nontestifying jointly tried codefendant's confession with a limiting instruction still violated the defendant's rights under the Confrontation Clause). The rules advisory committee notes to rule 804(b)(3) also recognize this inherent unreliability in positing that "a statement admitting guilt and implicating another person, made while in custody, may well be motivated by a desire to curry favor with the authorities and hence fail to qualify as against interest." **West's Federal *Criminal Code and Rules*** 287-88 (1991 rev. ed.).

The relatively recent recognition of declarations against penal interest as an exception to the hearsay rule by the Federal Rules of Evidence would seem to counsel against a headlong rush to broadly embrace the exception as providing a sufficient substitute for cross-examination and personal confrontation in cases of the present kind. We recognize that statements which adversely implicate the penal interest of the declarant

alone for many years have been widely recognized as normally reliable and, where the declarant is unavailable, have usually been admitted in evidence in federal and most state courts. *See* E. Clearly, *McCormick on Evidence* § 278 (3d ed. 1984). Arguably, such statements may be deemed a "firmly rooted" exception to the hearsay rule under the *Lee* formulation. On the other hand, even generally objectionable statements in which the declarant adversely implicates not only his own penal interest but also that of another may be made under circumstances that both suggest reliability and do not seriously invade the intended protections of the Confrontation Clause, such as statements made to a personal acquaintance in a noninvestigatory context where the setting suggests no motive to speak falsely. This distinction seems to be recognized by the rules advisory committee's reference to statements made "to an acquaintance." *West's Federal Criminal Code and Rules* at 288 (advisory committee notes to rule 804(b)(3)). Cf. **United States v. Triplett**, 922 F.2d 1174, 1178, 1182 (5th Cir. 1991) (statement to neighbor). Such statements might well fall into the **Lee** category of those shown to have "particularized guarantees of trustworthiness."

It appears to us, however, that there is another category of statements against penal interest that should generally be regarded as inadmissible under the Confrontation Clause, particularly where the declarant's unavailability is due simply to invocation of the Fifth Amendment in response to actual or potential prosecution, namely statements accusatory of another taken by law enforcement personnel with a view to prosecution. **Such statements have two characteristics that together make them inherently unreliable: (1) the declarant makes accusatory statements that inculpate another; and (2) these statements are made to nonundercover law-enforcement personnel after the commission of the offense. In that generic situation there always exists the strong possibility that the declarant has the "desire to shift or spread blame, curry favor, avenge himself, or divert attention to another."** Lee, 476 U.S. at 545, 106 S.Ct. at 2064. It is precisely in these circumstances that cross-examination, the "greatest legal engine ever invented for the discovery of truth," *see* 5 Wigmore, *supra*, § 1367 p. 32, is preeminently suited to determining the trustworthiness of a declarant's statements as envisioned by the framers of the Confrontation Clause.

The Confrontation Clause reflects "the ancient faith of the common law, incorporated by the founders in the Bill of Rights, that live confrontation and cross-examination of witnesses in the courtroom is the key to finding the truth in a criminal trial." **Gomez-Lemos**, 939 F.2d at 333. As noted by the concurrence in **Gomez-Lemo**s, "The framers of our Constitution were well aware of England's unhappy experience with Star Chamber procedures, and the Sixth Amendment was designed, in part, to forbid the use of the most objectionable of these procedures in the criminal courts of the United States." *Id.* at 334 (Nelson, J., concurring). Such objectionable procedures included sworn *ex parte* depositions used against defendants in criminal cases. Coke, Fourth Institute, Chapters 5 and 64. The Confrontation Clause was developed to "prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the

prisoner in lieu of a personal examination and cross-examination of the witness." **Mattox,** 156 U.S. at 242, 15 S.Ct. at 339; see also **California v. Green**, 399 U.S. 149 at 155-156, 90 S.Ct. 1930 at 1934, 26 L.Ed.2d 489 (1970); **White v. Illinois,** ___ U.S. ___, ___, 112 S.Ct. 736, 746, 116 L.Ed.2d 848 (1992) (Thomas, J., dissenting).

The hearsay rules operate in civil as well as criminal proceedings, and may be invoked by the government as well as by the citizen. But the Confrontation Clause applies only in criminal prosecutions and protects only the accused. Its "lineage ... traces back to the beginnings of Western legal culture." **Coy v. Iowa**, 487 U.S. 1012 at 1015, 108 S.Ct. 2798 at 2800, 101 L.Ed.2d 857 (1988). Moreover, "'the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact,'" **Maryland v. Craig**, 497 U.S. 836, 844, 110 S.Ct. 3157, 3162, 111 L.Ed.2d 666 (1990) (quoting **Coy**, 487 U.S. at 1015, 108 S.Ct. at 2800), "witnesses who confront him at trial, upon whom he can look while being tried." **Coy** 487 U.S. at 1017, 108 S.Ct. at 2801. The purpose of confrontation is not *solely* a function of conventionally explainable enhanced reliability, for in this respect the clause "serves ends related both to appearances and to reality," **Coy** 487 U.S. at 1017, 108 S.Ct. at 2801, has a "strong symbolic purpose," and responds to "'something deep in human nature that regards face-to-face confrontation between accused and accuser as "essential to a fair trial in a criminal prosecution."'" **Craig** 497 U.S. at 847, 110 S.Ct. at 3164 (quoting **Coy** 487 U.S. at 1015, 108 S.Ct. at 2800, quoting **Pointer v. Texas**, 380 U.S. 400, 403, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965)).

The use of *ex parte* depositions is still barred in criminal proceedings. Depositions may only be taken for a criminal trial if notice is given to all parties, the defendant is given an opportunity to be present personally and through counsel at the examination, and the scope and manner of examination and cross-examination are the same as would be allowed at the trial itself. Fed.R.Crim.P. 15. However, under **Vernor**, the substantial equivalent of an *ex parte* deposition may be taken, and used at trial against a defendant, where the prosecutor procures a declarant's grand jury testimony with an eye towards the later joint prosecution of the defendant and/or the declarant. In the case *sub judice,* Navarro's grand jury testimony, derived *ex parte* and without the benefit of counsel for either himself or Flores, comes perilously close to resembling England's Star Chamber proceedings. The government's choice of trying Navarro jointly with Flores in essence guaranteed that Navarro would be unavailable because he would invoke his Fifth Amendment privilege. The government, in effect, created its own unavailable declarant. The district court allowed this testimony into evidence against both defendants because it adversely implicated Navarro's penal interest and the district court was satisfied with its trustworthiness. **However, in the area of codefendants' confessions to law enforcement authorities that implicate another, this should rarely — if ever — be the case due, among other things, to their inherent unreliability. Lee**, 476 U.S. at 540, 106 S.Ct. at 2062.  (emphasis added).

The Supreme Court has never allowed the admission against a defendant of a codefendant's hearsay inculpatory statements to law enforcement authorities, although it has suggested that theoretically such hearsay could be admitted in appropriate circumstances. **Cruz v. New York**, 481 U.S. 186, 192, 107 S.Ct. 1714, 1719, 95 L.Ed.2d 162 (1987); Lee, 476 U.S. at 546, 106 S.Ct. at 2065. But that suggestion should not drive us to allow a codefendant's confession to law enforcement authorities to be admitted against the defendant merely because the district court is able to fairly recite a litany of factors and conclude that the particular confession has "sufficient indicia of reliability." In *Vernor,* the factors surrounding the making of the statement that were relied on to demonstrate its trustworthiness were: (1) the declarant took, without attempting to minimize, full responsibility for his role in the offense; (2) nothing indicated that the declarant made the statements to avenge himself or to curry favor with the authorities; (3) the authorities who procured the statements testified and were cross-examined at trial concerning the circumstances and contents of the statements; (4) no promises or plea bargains were made with the declarant; (5) the statements were made voluntarily; (6) the declarant was fully informed of his *Miranda* rights; and (7) the offense was still fresh in the declarant's mind. 902 F.2d at 1188.

**While the presence of these factors (as opposed to their opposites) doubtless renders a given confession more reliable than it would otherwise be, we are not persuaded that it substantially eliminates any reasonable possibility that the third party inculpatory portions of a confession to law enforcement personnel are unreliable.** As to the first factor, a declarant must incriminate himself in order to fit within the exception in the first place. Whether such incriminating statements describe the declarants' full role in the offense will rarely be determined from the confession alone. Taking on the full blame for a minor role in an offense, such as claiming to be a mere courier in a drug conspiracy, does little to demonstrate trustworthiness because the declarant still has the motive to shift the blame to others so as to receive a lesser penalty. In certain instances this concern might be resolved by other evidence, but **Wright** does not allow such evidence to be considered. The second factor views the *absence* of evidence showing improper motives as indicating trustworthiness. However, statements by suspects to law enforcement officials inculpatory of third parties are excluded because of the *presumption* that such motives exist, and the absence of evidence does not remove this presumption. **Lee**, 476 U.S. at 544, 106 S.Ct. at 2064. The third and fourth factors, though helpful in tending to indicate that the statements are not made in response to prior express inducements such as a plea bargain or other promise, do little to show that the declarant does not desire to curry favor with the authorities in the perhaps mistaken hope that he will receive some favorable consideration. Nor do they tend to negate a motive to avenge. The fifth and sixth factors, that the declarant made the statements voluntarily and with *Miranda* warnings, will generally be present when a confession is taken, and were present in **Lee**. The **Lee** court gave them no weight because they do not bear on whether the declarant's confession was free of the motive to mitigate the declarant's role in the offense. **Lee**, 476 U.S. at 544, 106 S.Ct. at 2064. The last factor, making the confession

shortly after the offense, does little to illuminate the declarant's motive. (emphasis added).

If one suspected of a particular offense confesses to the investigating authorities and implicates others, under the above-referenced **Vernor** factors that confession, including its accusations against the others, could generally be admitted as substantive evidence against all in a joint trial. In that context, the combined expansion of two generally benign evidentiary concepts — unavailability and declarations against interest — results in sanctioning evidence that has historically been viewed as generically suspect and violative of values at the very core of the Confrontation Clause. Where the government has the means to procure the declarant's trial testimony, the fact that there will often be "significant costs" (see **Lee** 476 U.S. at 550, 106 S.Ct. at 2067, Blackmun J., dissenting) in its doing so should not override one of our oldest and strongest legal traditions and the very essence of the Confrontation Clause, namely the protection against conviction on the basis of third party accusations made in *ex parte* confessions to law enforcement or prosecutorial authorities, where there is no opportunity for the defendant to cross-examine and personally confront — or for the trier of fact to observe — the declarant.

Cross page numbers unavailable.

This extended quotation was necessary to demonstrate that at the time this appeal was taken, Supreme Court authority mandated the exclusion of Sixto Monterrubio's confession. There was simply no excuse for Mr. Pena not to raise this issue.

Further, there is little doubt that Mr. Monterrubio was prejudiced by this failure of appellate counsel. Given that Sixto Monterrubio's confession provided the only evidence on a crucial element of the offense, that of corroborating the corpus delicti of the capital murder, the Court of Criminal Appeals would have had no choice but to reverse Mr. Monterrubio's conviction and, upon retrial, Mr. Monterrubio would not have faced a death sentence.

### IV  Mr. Monterrubio's request for counsel

As urged in the petition for writ of habeas corpus, Mr. Monterrubio's Fifth Amendment right against self incrimination was violated when the police failed to recognize his invocation of the right to counsel. The police picked up Mr. Monterrubio and asked him to come to the police station. Though he was not under arrest, they did give him his **Miranda** warnings. At one point, Mr. Monterrubio told an officer to tell his uncle, Sixto Monterrubio Sr. to get a lawyer for him, if he needed one. The officer relayed that information to the uncle. [12] Officer's Lucio and Pineda interrogated Mr. Monterrubio. While they at first, claimed to have no suspicion of Mr. Monterrubio's involvement in the murder of Carla Villareal. At one point, however they became very suspicious when Mr. Monterrubio became very nervous and gave contradictory statements. At this point, Mr. Monterrubio was in custody for Fifth Amendment purposes. Officer Lucio then went to Sixto, Sr., the uncle, and asked him to speak to his nephew to get Mr. Monterrubio to tell them the truth about what occurred. See SF-III-57. See also SF-XVII-386. Before the uncle was brought upstairs to see Mr. Monterrubio, Mr. Monterrubio asked Officer Lucio to ask his uncle to get him an attorney, if he needed one. Id at 387. See also Id at 58. The officer did as he was asked. Sixto, Sr. then told the Mr. Monterrubio to tell the truth and "whoever may fall, you just tell the truth." "Caigan quien caigan. Tu digas la verdad," Id at 57.

Though indeed ambiguous, the issue is not as easily resolved as Ms. Cockrell contends. In

---

[12]. The Court of Criminal Appeals ruled that the information was never given to the police and that Petitioner had simply told his uncle that he wanted him to secure an attorney if he needed one. "Appellant's request to his uncle and his uncle's response are a private matter involving no state action." See footnote 6, page 4, Opinion of Court of Criminal Appeals. The Court was simply wrong.

**Soffar v Johnson**, 237 F.3d 411 (5th Circ. 2000), the Fifth Circuit discussed the issue of

invocation of right to counsel.  There, Max Soffar was arrested for capital murder. He was taken

to the League City Police Department for questioning.  The Houston authorities secured the

cooperation of Sgt. MonterrubioClawson of the Galveston County Sheriff's Office to assist in the

interrogation because Soffar considered him a friend.  This friendship was a one way street;

Clawson felt it was his job to get Soffar to talk.  237 F.3d at 427. After two conversations, Soffar

was unwilling to continue the discussion.  Clawson returned to the interrogation room where

Soffar asked him whether he, Soffar, should get an attorney or talk to the detectives. Id at 429.

Clawson told Soffar that, if he were guilty, he should talk to the officers; if not, he should get an

attorney.  Soffar then asked Clawson how he could get one.  Clawson asked Soffar if he could

afford one, and, when learning he could not, Soffar asked how and when he could get a court

appointed attorney.  Clawson told him that he, Clawson, did not know Harris County procedures

and that it might take as long as a month.  Clawson knew this last statement was untrue.  Soffar

then told Clawson, that it looked like that he, Soffar, was on his own.  Clawson did not respond

to that last statement.  Soffar then talked to the other officers and gave a written confession. Id at

429-30.

The Respondent argues that this case is controlled by **Davis v United States,** 114 S.Ct.

2350 (1994).  In **Soffar**, however, the Fifth Circuit ruled that **Davis**, while it altered the prior

Fifth Circuit standard of **Nash v Estelle**, 597 F.2d 513 (5th Circ. 1979) (en banc), it did not

completely usurp its  role.  **Nash** had limited police authority, when confronted with vague

invocations of the right to counsel, to those questions designed to clarify the vague request for

counsel and **Davis** clearly abrogated that rule.

Nothwithstanding the applicability of **Davis**, however, we note that **Davis** specifically recognized that, while officers are not required to ask *clarifying* questions when they are faced with an ambiguous request for counsel, "it will often be good police practice for the interviewing officers to clarify whether or not [the suspect] actually wants an attorney." **Davis** 114 S.Ct. At 517. Nothing in **Davis** altered our holding in **Nash** that interrogating officers who do seek clarification of an ambiguous or equivocal request for counsel. Are not permitted "to utilize the guise of clarification as a subterfuge for coercion or intimidation." **Nash** 597 F.2d at 517. Nor did **Davis** alter our holding in **Thompson** [ **v. Wainwright,** 601 F.2d 768 (5th Circ. 1979)] that, when clarifying an ambiguous or equivocal request for counsel, under no circumstances may an officer "mislead [ a suspect] into abandoning his equivocal request for counsel." **Thompson**, 601 F.2d at 772. Indeed, the interpretations of **Miranda** and **Edwards**, set forth in our decisions in . . . **Thompson**, and **Nash**, insofar as they are consistent with **Davis**, . . . and other relevant Supreme Court cases, remain untouched and reaffirmed as circuit precedents.

Thus, the law applicable to Soffar's conviction dictates that, in interrogating officers are confronted with an ambiguous or equivocal request for counsel, under **Davis**, they are not required to cease interrogation. However, if under **Davis**, the officers exercise good police practice and seek clarification, under this Circuit's holdings in **Nash** and **Thompson,** the officers may not use the clarifying inquiry or their responses to an ambiguous or equivocal request for counsel to coerce, intimidate, or trick the suspect into abandoning his ambiguous or equivocal request for counsel. Such coercion, intimidation, or trickery in order to get a suspect to abandon an unclear request for counsel is not permitted under **Miranda** or **Davis**, and is explicitly prohibited by **Nash** and **Thompson.**

237 F.3d at 453.

The Court then went on to discuss whether, under the circumstances set forth above, Soffar had made an **unequivocal** request for counsel, a request that should have cut off all police interrogation. Id at 454. The standard for the request is clear: "Although a suspect need not speak with the discrimination of an Oxford don,' he must articulate his desire to have counsel present sufficiently clear that a reasonable officer would understand the statement to be a request for an attorney." **Davis**, 114 S.Ct. at 2355. Given that the court must indulge every presumption against waiver and resolve all doubts in favor of protecting constitutional claims, the court must

give a broad, rather than a narrow interpretation of a suspect's request for counsel. **Soffar v Johnson**, 237 F.3d at 455, citing **Michigan v Jackson**, 475 U.S. 625 (1986). The Fifth Circuit went on to hold that, given all of these circumstances, Soffar's requests to Clawson constituted an unequivocal request for counsel.

In the case at bar, clearly the police sought to use Sixto Monterrubio, Sr. to prevent Jose Monterrubio from continuing his insistence, albeit equivocal, right to counsel. It should have been clear to any police officer that a 17 year old boy was trying to assert his right to counsel. While the police did not resort to trickery, they carefully avoided the issue by not engaging in the kind of good police work recommended in **Davis** and narrowly construing the request for counsel as one limited to a request to Sixto Monterrubio, Sr. to find an attorney. Further the police utilized Sixto's relationship with his nephew in order to induce Jose Monterrubio to provide the police with a confession, rather than honor Jose's request for counsel, or at the least, do no more than that recommended by **Davis** and clarify it to make certain that Jose Monterrubio genuinely under the standards of **Miranda v Arizona**, 385 U.S. 436 (1966), wished to waive his right to counsel.

Because the Court of Criminal Appeals decided this issue based on an incorrect recitation of the facts, this Court is not bound either by the factual findings of that Court or its legal conclusions. **Puckett v Elem**, 514 U.S. 765, 769 (1995) (state court fact findings may be disregarded or set aside if they are not fairly supported by the record); **Parker v Dugger**, 498 U.S. 308, 316-17, 320 323-24 (1991); **Burden v Zant**, 510 U.S. 132, 133 (1994) (per curiam) (state court fact findings disregarded because of manifest mistake). Because theses findings are

not binding on the Court, this Court should deny the Respondent's Motion for Summary

Judgment and conduct a hearing on these allegations.

### V. Sufficiency of the Evidence to Support Future Dangerousness

Ms. Cockrell argues that the evidence is sufficient to support the jury's finding of future

dangerousness based solely on the facts of the offense. In a different context, the Fifth Circuit

described this argument as a "stereotypical fall back argument." **Gardner v Johnson** ___ F.3d

____ (Fifth Circuit, April 4, 2001). [13]

> [O]ur decades of experience with scores of Section 2254 habeas cases from the death row
> of Texas teach an obvious lesson that is frequently overlooked. Almost without
> exception, the cases we wee in which conviction of a capital crime has produced a death
> sentence arise from extremely egregious, heinous, and shocking facts. But, if that were
> all that is required to offset prejudicial legal error and convert it to harmless error, habeas
> relief based on evidentiary error in the punishment phase would virtually never be
> available, so testing for it would amount to a hollow judicial act. We are satisfied that
> here, Dr. Griffith's testimony cannot conceivably be said to have had no substantial,
> injurious effect on the outcome of the penalty phase of this case: . . .

As the Court noted, to "permit a jury to impose the death sentence solely because the facts are

heinous and egregious would be to return to the days of inflicting capital punishment based on

emotion and revenge, supplanting altogether the questions of deliberateness and future

dangerousness which make the Texas scheme constitutional." This claim should be sustained.

Mr. Monterrubio was only a fews days past his 17th birthday when this offense was committed.

No punishment evidence was introduced by the State: no prior acts of violence or even

misconduct of any kind, no psychiatric evidence, no opinion evidence, in short, nothing other

---

[13]. The comments of the Fifth Circuit did not address a sufficiency claim as presented
here. There the Court was concerned about a Fifth Amendment violation based on the use of a
psychiatrist at the punishment phase under **Estelle v Smith**. Counsel contends, however, that the
analysis is appropriate here.

than the facts of the offense to support the verdict. To allow this verdict to stand would be tantamount to allowing revenge and emotion to carry the day.

## VI. Ineffective Assistance of Counsel

As alleged in his Petition for Writ of Habeas Corpus, Mr. Monterrubio was deprived of the effective assistance of counsel at trial. Mr. Monterrubio alleges in his petition that counsel's performance was deficient for a number of reasons. Ms. Cockrell takes the position that Mr. Monterrubio would have to show that each alleged deficiency, standing alone, would be enough to find ineffective assistance of counsel. That is not the law.

The standard of review for ineffective assistance of counsel is set out in **Strickland v. Washington,** 466 U.S. 668 (1984) as "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." The defendant must show that there is a reasonable probability that but for counsel's mistakes, the result would have been different. Id. "Reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome."

One of the many errors which Mr. Monterrubio alleges in his writ is that trial counsel did not request a special venire pursuant to Article 34.01 of the Texas Code of Criminal Procedure. Ms. Cockrell takes the position that failure to do so was not harmful because the request would have been denied. She bases her position on the fact that the Judge denied Defendant's Motion to Strike the Jury Panel. Defendant's Motion to Strike the Jury Panel was filed on October 10, 1994, the first day of trial. (Clerk's Record p. 275) It is impossible to say that the Court would have denied a timely-filed Motion for Special Venire just because it denied a last-minute Motion to Strike the Jury Panel.

Mr. Monterrubio next alleges that his trial lawyer should not have let Laura Becerra serve on the jury. Ms. Becerra testified during voir dire as follows: "As far as that –if he is guilty, then –then he probably would go to the death penalty, as you're looking for. But if it's not proven that he is guilty then we can't do that." SF-X-220 lines 20-23. Clearly Ms. Becerra said that if the Defendant was found guilty she would assess the death penalty and that the only reason she would not assess the death penalty would be if the Defendant was found not guilty. Not only did Counsel not challenge Ms. Becerra for cause, but he didn't even try to clarify whether the prospective juror met the standard set out in **Wainwright v. Witt**, 469 U.S. 412 (1845). Moreover, having heard that the only way the Defendant would avoid being sentenced to death by this juror, Defense Counsel did not use a peremptory challenge on her but instead told the Court that she was acceptable. SF-X-235, line 19. It is hard to imagine how letting a person who has said that she will assess the death penalty if the defendant is found guilty can be categorized as "trial strategy" for a <u>defense</u> lawyer. Obviously the failure the exercise a peremptory challenge was prejudicial to Mr. Monterrubio.

Mr. Monterrubio alleges that his trial counsel failed to voir dire any of the prospective jurors on punishment issues. The record clearly shows that the only question counsel asked regarding punishment was whether or not prospective jurors could consider probation in the event of a conviction for the lesser included offense of murder. Once again Ms. Cockrell takes the position that this was trial strategy and not ineffective assistance.

It is impossible to fathom what kind of defense trial strategy would cause a lawyer not to ask questions on voir dire that would lead to intelligent use of peremptory challenges and use of challenges for cause.

Along the same vein, Mr. Monterrubio alleges that trial counsel was ineffective in that he did not present any mitigation evidence at punishment. He did not even present the evidence developed by Mr. Monterrubio's previous lawyer that Officer Pineda, one of the investigating officers, thought that Mr. Monterrubio was under the domination or control of his cousin Sixto, the co-defendant. Neither did he present the obvious evidence that Mr. Monterrubio turned 17 years of age a mere ten days before the crime was committed. Once again it is hard to see how this could have been trial strategy.

The final allegation that Mr. Monterrubio makes is that counsel's performance was deficient in that counsel did not object to the introduction of enormous amounts of hearsay testimony, including victim impact testimony at the guilt-innocence phase of the trial. Ms. Cockrell concedes that most of this evidence is inadmissible hearsay but takes the position that trial counsel was just using trial strategy and cannot be faulted for not objecting. She states that as to all the hearsay testimony that came in regarding the victim's relationship with Sixto Monterrubio , counsel was attempting to divert attention and blame from Monterrubio onto his accomplice, which is a valid and sound defense strategy.

One clear indication that the failure to object to the hearsay testimony was negligence and not part of the defense strategy is that at no time during his final argument on guilt/innocence did defense counsel attempt to shift the blame to Sixto Monterrubio. S.F. Vol. XIX, 558-571.   In fact during his argument he told the jury "I don't know what Sixto's involvement was here. We are not here to try Sixto." SF-Vol. XIX, 561. These statements clearly show that there was absolutely no strategy employed in not objecting to the hearsay testimony.

For purposes of an ineffective assistance of counsel claim, the reviewing court must look

at the whole performance of the lawyer and not just at specific mistakes and must decide if the

trial resulted in a verdict worthy of confidence. **Kyles v. Whitley,** 514 U.S. 419, 434 (1995).

When the performance of trial counsel is reviewed as a whole, it is impossible to say that the

verdict reached in Mr. Monterrubio's case is worthy of confidence.

A. Exhaustion of Remedies

Ms. Cockrell argues that Mr. Monterrubio has failed to present most of these claims to

the state courts and thus, the claims cannot be addressed because of the doctrine of exhaustion.

While all but two of the claims have not been raised in state court, the two being the invocation

of the right to counsel and sufficiency of the evidence to support the finding of future

dangerousness, that failure does not end the inquiry.

Mr. Monterrubio has no adequate remedy at state law and thus, exhaustion poses no

hurdle to this Court's resolution of his claims on the merits. The most obvious exception is the

absence of a state corrective process. 28 USC Section 2254(b)(1)(B) excuses exhaustion if, at the

time the habeas petitioner files the federal petition, there is no available state procedure to secure

review of the unexhausted claim. This exception applies even if at an earlier or later stage of the

proceedings a remedy becomes available. See Liebman and Hirtz, Federal Habeas Corpus

Practice and Procedure, Section 23.3 p. 987 (Lexis 1998). This exception also applies if the

petitioner failed to present the claims at earlier proceedings as Ms. Cockrell is now contending.

See **Coleman v Thompson**, 501 U.S. 722, 732 (1991); **Carter v Estelle**, 677 F.2d 427, 444 fn.

13 (5th Circ. 1982).

### B. Procedural Default

For the same reasons as set forth above, Mr. Monterrubio contends that the procedural

default is excused by his state habeas counsel's ineffectiveness.

Respectfully submitted,


Michael B. Charlton
1744 Norfolk
Houston, Texas 77098
(713) 572 2333
(713) 572 2483 (fax)
State Bar of Texas 04144800
Federal Bar # 8663
COUNSEL FOR JOSE IGNACIO MONTERRUBIO


_____
Elisa Vasquez
613 19th Street
Galveston, Texas 77550
(409) 763 2131
(409) 763 4104
State Bar of Texas 20502100
Federal Bar # 11701
COUNSEL FOR JOSE IGNACIO MONTERRUBIO

### CERTIFICATE OF SERVICE

This is to certify that a copy of this Summary Judgment Response was served on

opposing counsel, Tina Dettmer, of the Texas State Attorney General's Office, P.O. Box 12548,

Austin, Texas 78711 by mailing a copy of same on January 3, 2003.


Michael B. Charlton

*Monterrubio Summary Judgment Response*
*October 29, 2001 p.33*